CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

KENNETH M. SORENSON
MICAH SMITH
MICHAEL F. ALBANESE #9421
Assistant U.S. Attorneys
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:  Ken.Sorenson@usdoj.gov
        Micah.Smith@usdoj.gov
        Michael.Albanese@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Feb 08,2022,10:59 am
Michelle Rynne, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO.  22-00012DKW |
| | ) | |
| Plaintiff, | ) | INFORMATION |
| | ) | |
| vs. | ) | [18 U.S.C. §§ 1343 and 1346] |
| | ) | |
| JAMIE KALANI ENGLISH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INFORMATION

The U.S. Attorney charges:

## INTRODUCTORY ALLEGATIONS

1.     From in or around November 2014 until in or around May 2021, JAMIE KALANI ENGLISH, the defendant, was the Senate Majority Leader of the Hawaii State Senate (the "Senate"), which is one of the two houses of the State of Hawaii legislature.  While holding that position of trust, beginning in or around 2015 and continuing up to in or around January 2021, ENGLISH engaged in a scheme to deprive the citizens of the State of Hawaii of his honest services as an elected legislator and Senate Majority Leader.

2.     As part of his scheme, ENGLISH accepted bribes from "Person A," the owner and operator of a Hawaii-based business.  In exchange for those bribes, ENGLISH agreed to provide, in his official capacity as a member of the Senate, legislative support that would be beneficial to Person A's company.

3.     Furthermore, despite ENGLISH's ethical and statutory obligation to do so, ENGLISH did not disclose these bribe payments on the State of Hawaii mandatory Gift Disclosure Statement required of all legislators who receive a gift valued at more than $200.  By failing to disclose the bribes he received, ENGLISH concealed this material information from both the State Ethics Commission and the people of Hawaii.

## The State of Hawaii Legislature

4.      The State of Hawaii legislature is the legislative branch of the State of Hawaii government, a body composed of the Senate and the Hawaii State House of Representatives (the "House").  The Senate is comprised of 25 members elected to four-year terms and the House is comprised of 51 members elected to two-year terms.

5.      Under the Constitution of the State of Hawaii (the "Constitution"), state legislators are duty bound to faithfully act for the benefit of the community. The Constitution recognizes that legislators exercise power entrusted to them by the people:  "All political power of this State is inherent in the people and the responsibility for the exercise thereof rests with the people.  All government is founded on this authority."  Art. I, § 1.  The entrusted legislative power is substantial:  it "extend[s] to all rightful subjects of legislation not inconsistent with this constitution or the Constitution of the United States."  Art. III, § 1.  And the Constitution underscores that the people of Hawaii expect these powers to be exercised faithfully and honestly:  "The people of Hawaii believe that public officers and employees must exhibit the highest standards of ethical conduct and that these standards come from the personal integrity of each individual in government."  Art. XIV.

3

6.     Consistent with the expectation that legislators and other public officers will exhibit the highest standards of ethical conduct in carrying out their substantial responsibilities, the Constitution of the State of Hawaii provides that "[a]ll eligible public officers, before entering upon the duties of their respective offices, shall take and subscribe to the following oath or affirmation:  'I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States, and the Constitution of the State of Hawaii, and that I will faithfully discharge my duties as _____ to the best of my ability.'"  Art. XVI, § 4.  The oath requirement applies, among others, to "the members of both houses of the legislature."  *Id.*

7.     Hawaii state law also explicitly prohibits legislators from accepting bribes and thereby acting in a manner that serves their own interests, rather than the interests of the community.  Specifically, Hawaii Revised Statutes § 710-1040 makes it a crime for a legislator to solicit or accept a pecuniary benefit with the intent that the legislator's vote, opinion, judgment, exercise of discretion, or other action as a public servant would thereby be influenced.  Moreover, with limited exceptions not applicable here, Hawaii state law requires legislators to file a Gift Disclosure Statement, by June 30 of each year, disclosing any gifts "valued singly or in the aggregate in excess of $200, whether the gift is in the form of money, service, goods, or in any other form" whenever the "source of the gift or gifts have

interests that may be affected by official action or lack of action by the legislator or employee." Haw. Rev. Stat. § 84-11.5.

### ENGLISH's Official Powers in the Senate

8.    At all times relevant to this Information, ENGLISH was a Hawaii State Senator representing the 7th Senatorial District, which includes Hana, East and Upcountry Maui, Molokai, Lanai, and Kahoolawe.  ENGLISH was first elected to the Senate beginning in approximately November 2000 and, over the years, held a number of positions on various committees.  At times relevant to this Information, ENGLISH served as the Senate Majority Leader and as Vice Chair of the Senate Committee on Technology, and was a member of the Senate Committees on Ways and Means and Transportation.

9.    ENGLISH was a member of the Cesspool Conversion Working Group (CCWG), which was established pursuant to Act 132 of the Session Laws of Hawaii in 2018.  Act 132 recognized that "public health and the quality of Hawaii's drinking water, streams, ground waters, nearshore marine areas, and ocean are being harmed by water pollution from cesspools," Act 132, § 1, and charged the CCWG with developing a comprehensive statewide plan for converting cesspools to more environmentally-responsible waste treatment systems or connected sewer systems by the year 2050.  The CCWG was tasked with providing an interim report of its preliminary findings and recommendations,

5

including proposed legislation, to the legislature no later than December 31, 2019, and with submitting a final report, including findings, recommendations, and any proposed legislation, to the legislature no later than twenty days prior to the convening of the regular session of 2021. *See* Act 132, § 2(e).

Person A

10.     At all times relevant to this Information, Person A was the owner and operator of a Hawaii-based business that conducted industrial service business throughout the State of Hawaii.  Among other things, Person A's business regularly entered into contracts with county governments to provide services and products in the area of wastewater management.  Person A's business was well positioned to avail itself of publicly financed cesspool conversion projects.

Overview of ENGLISH's Fraudulent Scheme

11.     On a date within the last several years, Person A asked ENGLISH to support the passage of legislation pending before the Senate that would create and fund a large project.  Although the legislation did not specifically provide any contracts to Person A's company, Person A's company had a significant advantage in being awarded a sub-contract because it was one of the few companies that could do the work.  ENGLISH was by this point familiar with the nature of Person A's business.  In response to Person A's request, ENGLISH provided his support to the legislation.  After the legislation passed, Person A gave ENGLISH several

6

thousands of dollars for ENGLISH to purchase food and drinks for a political

gathering ENGLISH was hosting.

12.     Beginning in or around 2019, ENGLISH and Person A began to

discuss cesspools.  In exchange for a stream of benefits that included hotel rooms

and outright cash, ENGLISH agreed to support specific legislation that would

favor Person A's business.  When ENGLISH was informed that Person A was

supportive of the legislation, ENGLISH took official action to promote its passage.

When, at a later date, Person A paid ENGLISH $10,000 in cash to "kill" the

legislation, ENGLISH changed course and agreed to do so, telling Person A that

"[i]t's easy to kill bills."

### ENGLISH and Person A Discussed Cesspools and the CCWG

13.     ENGLISH and Person A met on or around May 8, 2019.  The

discussion turned to cesspool legislation, and Person A asked, "I think there's a

cesspool committee out too, right?  I don't know how far they've gotten . . . . You

can probably get more information on that . . . ."  ENGLISH interjected and said,

"well, I'm on the committee."  Person A expressed surprise and added, "that's

helpful."  ENGLISH elaborated:  "so I've never attended the meeting purposefully

because . . . I don't want to overshadow their work . . . but I get all the minutes, so

I know what's going on . . . [be]cause at the end they have to turn their report in to

the legislature."

14.     Person A asked ENGLISH if it would be possible to get a copy of the committee's draft report, and ENGLISH replied, "sure." At a later point in the conversation, Person A told ENGLISH, "if there's something I can do for you Kalani, you let me know." ENGLISH responded, "thank you." Person A then added, "There's gonna be things that I have to ask as well, and I appreciate you, as my brother and friend . . . there's things that you cannot do, no problem . . . there's things that I cannot do, no problem. But, together we find a way."

<u>ENGLISH Solicited Hotel Rooms and Cash and</u>
<u>Agreed to Send Person A the CCWG's Draft Report</u>

15.     On or around June 7, 2019, ENGLISH called Person A and informed Person A that he was traveling to Las Vegas, Nevada to attend a concert. ENGLISH expressly asked Person A to obtain two hotel rooms for him in Las Vegas, Nevada between June 19, 2019 to June 23, 2019. During the same call, ENGLISH also informed Person A that he would send Person A, via email, a draft report the CCWG had authored. The draft report identified solutions to convert cesspools and Person A's company could potentially benefit from modifications to the draft report. Person A's company would benefit from having early access to the draft report in that Person A would have an opportunity to submit input and/or comments on the draft to ENGLISH.

16.     On or around June 11, 2019, Person A called ENGLISH. During the call, Person A informed ENGLISH that Person A would obtain the Las Vegas

8

rooms for ENGLISH, and explained that Person A would likely put the rooms in
Person A's name in order to secure possible comps and discounts.  ENGLISH
answered, "Oh, cool.  Thank you, oh [Person A], really appreciate it."  Then
Person A turned to what he/she sought in return:  "No problem, hey hey, so Kalani,
um, one thing um, regarding the document, um, for the cesspool stuff can you . . .
."  ENGLISH asked, "Oh, you got it?"  Person A replied that he/she had not yet
received the CCWG report.  ENGLISH responded that he had previously sent the
report to one of Person A's email addresses but would send the report to another
email address belonging to Person A.  ENGLISH explained that the report was still
in the draft stage and that he wanted Person A to review it and provide ENGLISH
with comments.  ENGLISH stated: "Well it's the draft, so that's why it's now
waiting for the comments.  That's why I wanted you to look at it.  Because, if it has
comments, then I can, I can send it in.  I can say do this, no we don't like this, we
like that."

        17.    ENGLISH then turned to another matter for which he sought Person
A's help:  "So, I'm, I'm coming to Honolulu tonight, um, and then I have, uh,
actually you know [Person A] if you can help me with one other thing?"
ENGLISH explained that he had family/friends who were coming into town from
Tahiti.  Person A had never previously met or spoken to ENGLISH's
family/friends from Tahiti.  ENGLISH stated: "I have, um, like a grandma in,

from, you know, an older lady, her daughter, and her son, grandson, and their daughter, um, in from Tahiti . . . so I'm going to see them . . . in Honolulu. Do you think we could take them out somewhere?" ENGLISH was, in fact, asking Person A to host ENGLISH's large family group by attending and paying the dinner bill. Person A responded: "Absolutely, uh well, I may not be able, well, tomorrow I got like some guests in town from California, but I can help you out with it." ENGLISH responded: "Sure."

18.    Later that day, on or around June 11, 2019, ENGLISH emailed a copy of the CCWG draft report to Person A. The document was a draft not intended for public distribution. Within its provisions it included, for example, passages such as "Other notes (not to share)"; "Cost SOOO important to narrow the scope"; and "a hypothetical bookend. Should NOT be included".

19.    On or around the next day, June 12, 2019, ENGLISH and Person A attended a lunch meeting together. During the meeting, ENGLISH again informed Person A that Person A could submit draft comments regarding the CCWG report. ENGLISH stated: "Well they're still open for, you know, because it's a draft—and they are asking us to give comments. If there's any comments you guys want, just write them out and I can submit it." Person A then turned to the matter of ENGLISH's request for help with the dinner he was hosting with his Tahitian guests. Person A stated, "Oh, by the way, housekeeping wise, um, sorry um that I

can't make dinner tonight, but um, but anyway, yeah um, this is the help. Five hundred [$500], for you." ENGLISH accepted an envelope with $500 in cash and said, "Appreciate it." Person A then told ENGLISH, "Yeah, for like, you know for dinner but thank you for um sending that report."

20.    ENGLISH and Person A continued their conversation over lunch. Several topics of small talk arose, including a discussion about the Tahitian guests and where ENGLISH would likely take them. Person A then told ENGLISH that "if the bill comes in under 300 or 350 just keep it. You know?" ENGLISH replied, "Ah, thank you." Person A then made comments indicating that he/she was providing ENGLISH the money because Person A was focused on the draft report and the possibility of shaping legislation and obtaining financial benefits for Person A's business: "For yourself, yeah. Whatever you hear. You know. But, I want to thank you for like um . . . you know for supporting this and I think in the end, Kalani, um we're going to, you know, collectively there's going to be a lot of um . . . a lot of benefits for everybody in—in return." Person A then flagged for ENGLISH that one thing Person A noted in the draft report was that "the technology that is called out . . . . We're the only ones that have sole source solution for that." ENGLISH responded, "Cool. Good."

21.     On or around June 14, 2019, ENGLISH sent Person A the following instant message: "Mahalo [Person A], I took the family to [Redacted] Chinese restaurant and everyone had crab. They were all very happy. Mahalo again!"

22.     Person A paid for two hotel rooms in Las Vegas, Nevada that ENGLISH had requested.  The receipt from the hotel shows that the arrival date was June 19, 2019, the departure date was June 23, 2019, and the listed guest name was Person A.  Person A paid for two rooms for that time period, each for $902.50, for a total of $1,805.

ENGLISH Agreed to Support Proposed
Cesspool Legislation Favorable to Person A's Business

23.     On or around January 14, 2020, ENGLISH, Person A, and others attended a dinner meeting at a restaurant in Honolulu.  During the meeting, Person A told ENGLISH about a House bill relating to cesspools ("House Bill 1") and described some of the substance of the bill and the pilot program it would establish.

24.     ENGLISH then offered his legislative services to introduce a Senate companion bill to House Bill 1, indicating his willingness to introduce a Senate cesspool bill in order to benefit Person A's business interests.   ENGLISH even inquired with Person A as to at one point whether Person A wanted a "non-Maui person to introduce it or do you want a Maui guy . . . ."

### ENGLISH Received Email of the Draft Bill and ENGLISH Confirmed That He Had Introduced a Companion Bill in the Senate

25.     On or around January 21, 2020, Person A emailed ENGLISH a copy of House Bill 1.

26.     On or around January 23, 2020, Person A called ENGLISH.  During the call, ENGLISH confirmed that he did introduce a companion bill to House Bill 1.  ENGLISH then clarified that although his Senate bill was similar to House Bill 1, it was actually a companion to a different bill introduced by another State Representative ("House Bill 2").

27.     The companion bill of which ENGLISH spoke was S.B. 2380, which ENGLISH had introduced on or around January 17, 2020.  The thrust of S.B. 2380 would make funds available to test technologies for waste management solutions through a pilot program.

### Person A Paid ENGLISH $1,000 For Introducing S.B. 2380

28.     On or around February 24, 2020, ENGLISH and Person A met at a restaurant in Honolulu.  During the meeting, Person A paid ENGLISH $1,000 in cash for introducing S.B. 2380.  After providing ENGLISH the $1,000, Person A stated: "That's—that's for you for all that, you know, for putting that—that beautiful, um, . . . bill.  I think it got . . . ."  ENGLISH interjected: "Thank you. It's moving.  Yeah."  Person A responded, "It is?  Oh great."  Person A explained

to ENGLISH that "it's a significant project for us—and, um, you know, for the state—but also, you know, for our business, so, you know . . . ."

29.  Later in the dinner conversation, Person A again brought up the topic of the bill and told ENGLISH, "it's good to hear that the bill is moving." Person A said it would be helpful to know where it is, and mentioned that he/she had downloaded the language. ENGLISH told Person A that "the original language" was from House Bill 2, which was similar to "the one you wanted." ENGLISH then confirmed that "it's moving," and then explained that "I kind of don't pay attention to all the bills," to which Person A replied that he/she would "keep an eye on it" himself/herself. ENGLISH then explained to Person A that he/she, "should formulate what you would like to see" in the bill.

30.  At a later point in the dinner, ENGLISH explained the status of the bills and what legislative steps were going to happen next. ENGLISH mentioned that "50 percent of the bills have gone by the wayside right, so we're, things are sorting." ENGLISH then indicated has willingness to allow Person A to sculpt the legislation stating: "think about what you would like to see the, for the cesspool bills," clarifying that "you don't have to think about the language, just think about the outcomes, I'll, I'll deal with the language."

31.  At an even later point in the evening, Person A told ENGLISH, "Kalani, believe me, you've been so, uh, gracious and helpful to me. I will, um,

14

exhaust the resources to, um . . . try and get, get, you some, um, help, you know,

uh . . . and then, um, but I appreciate all the stuff you've done, and um, I'll

continue to support you.  And maybe we can find other things, um, that we can

collaborate on.  I do appreciate your assistance . . . submission of the bill and then,

um, appreciate you providing that recommendation to . . . come up with that, you

know, the language, at least, you know, the point of the matter."  At the end of the

dinner, Person A, as was the expected practice when dining with ENGLISH, paid

the bill of $592.14.

### ENGLISH Accepted $10,000 to Kill the Bill

32.    Although ENGLISH had expressed commitment to helping to pass the

cesspool bills when Person A sought that assistance, when Person A asked at a

later date for him to kill the cesspool bills, ENGLISH agreed to do so.  On or

around March 11, 2020, ENGLISH met with Person A.  The meeting took place in

Person A's vehicle.  During the meeting, Person A told ENGLISH that for

unanticipated reasons, he/she needed ENGLISH to delay the passage of the

cesspool bills until next session, and paid ENGLISH a bribe totaling $10,000 in

cash to see to it that the cesspool bills were killed.

33.    ENGLISH and Person A had the following conversation about killing

the cesspool bills:

Person A:  I need to, um, delay that bill like until the next session. Because then I know like you—you're the one that submitted it so—and I don't know how complex this is and I want to—want to—

ENGLISH:  Well it's easy to kill bills.  It's hard to pass them.

Person A:  I need both of those kind of like . . . .

ENGLISH:  You need both of them killed?

Person A: Yeah, yeah.

ENGLISH:  Okay.

Person A:  Is that?  I mean—I mean—you know, I don't know how that's done.

ENGLISH:  It's easy to kill bills . . . . This one I can—I can make sure it doesn't move in the money committees.  The one that's on the House side, um, you know let me just see where it is and I can see it, I can just tell the Chairs, hold off . . . .

34.     At this point in the conversation, Person A informed ENGLISH that a nearby envelope contained $10,000 in cash for ENGLISH:

Person A:  So, open up that folder.  I was going to give you this.  Okay, that's like just, cause, and, and the—that's—that's ten [$10,000].  Uh—the only thing is that, as the economy dips and—and we're still in a pretty healthy economic position, I want to ensure that—uhm—now that we're—uh—I mean, we can do this and support our guys then I want to do it now rather than later when you just kind of like are tapped out.

ENGLISH: Thank you.

35.     Person A ended the conversation with ENGLISH by saying, "if you could really help out with this, Kalani, to ensure . . . and I'm sorry that you had to,

16

like, go through this for me."  ENGLISH then responded to Person A stating:  "this is all, this all part of the work, right, I mean, like I said, to pass a bill is difficult. To kill a bill . . . easy."  Both ENGLISH and Person A laughed, and Person A then stated that they would talk again "just to get a pulse on what's happening," and asked ENGLISH to keep him/her posted.  ENGLISH then exited the vehicle.

<u>Person A Followed up with ENGLISH about the Cesspool Bills</u>

36.    Following the meeting on or around March 11, 2020, Person A followed up with ENGLISH to check on the status of ENGLISH's efforts to kill the cesspool pilot program legislation.

37.    On or around April 10, 2020, Person A called ENGLISH.  During the call Person A explained that his/her partners were concerned about the status of the cesspool legislation and were looking for assurances.  In response, ENGLISH told Person A that "because we, um, we, we suspended the legislature . . . basically everything froze in place. . . all of these types of bills. . . these will die.  But they'll just, they'll remain there, and we probably will not go back into session . . . . all the bills will die."  Person A responded that his/her partners were "insecure" and put a lot of "resources" and "effort" into the matter.  Person A then pressed ENGLISH for an assurance that ENGLISH would indeed follow through with killing the cesspool legislation if it came back before the legislature.   ENGLISH then responded: "absolutely."

38.     On or around June 30, 2020, Person A made another call to

ENGLISH.  During the call, Person A followed up with ENGLISH on the status of

the bills:

> Person A:  I also wanted to touch base with you on the, you know, thing
> we're working on with that bill . . . and you know see how everything is
> going with that.
>
> ENGLISH:  Yeah none of it is moving right?
>
> Person A:  Well yeah, well yeah last I checked, but, you know I just was
> checking to see.
>
> ENGLISH:  Yeah, I, I, actually have been, I think, I, I been keeping an
> eye on it so I don't think any of it is, any of it is moving.  Um, there have
> been a few bills that have, that have caught us by surprise that the House
> moved in.  Of course, we moved a few that caught them by surprise, but
> none of those.

### Concealment of Material Information

39.     As mentioned above, as a state legislator, ENGLISH is required to file

an annual Gift Disclosure Statement, by June 30 of each year, disclosing any gifts

"valued singly or in the aggregate in excess of $200, whether the gift is in the form

of money, service, goods, or in any other form" whenever the "source of the gift or

gifts have interests that may be affected by official action or lack of action by the

legislator or employee."  Haw. Res. Stat. § 84-11.5.

40.     The Gift Disclosure Statement for gifts received between June 1, 2019

through May 31, 2020, was due by June 30, 2020.  ENGLISH electronically filed

his Gift Disclosure Statement with the Hawaii State Ethics Commission on June 30, 2020.

41.    In his Gift Disclosure Statement, ENGLISH knowingly and purposefully failed to declare the receipt of any of the funds or financial benefits conferred upon him by Person A, including the hotel rooms provided to him in June 2019 at a cost of $1,805, the $500 in cash provided to him in June 2019, the $1,000 in cash provided to him in February 2020, or the $10,000 in cash provided to him in March 2020.

42.    At the same time, ENGLISH scrupulously disclosed small gifts he received from legitimate sources during that same time period, including, among other things, gifts of $7 worth of trail mix from a private company, $10 worth of chili pepper water from the County of Kauai, a $20 goody and snack bag from the Maui County Council, and a $22 grocery bag of vegetables from a law firm. ENGLISH also disclosed travel and hotel stipends that he received from legitimate sources, including a $200 hotel stipend from the National Conference of State Legislatures.

43.    By disclosing these legitimate gifts while concealing the bribes that he accepted for official action, ENGLISH defrauded the citizens of Hawaii, who were entitled to ENGLISH's honest and faithful services and entitled to know that ENGLISH had failed to provide those services.

## ENGLISH Accepted Another $5,000 Bribe

44.     On January 14, 2021, ENGLISH and Person A met in Person A's
vehicle in the Kaka'ako area of downtown Honolulu.  After ENGLISH entered the
vehicle, Person A handed him an envelope and told him, "that's money for you.
$5,000".  Person A then thanked ENGLISH for "all his support," and indicated the
type of legislative assistance he/she would need from ENGLISH.  ENGLISH then
placed the $5,000 in currency into his back pocket and told Person A, "I can
definitely use that right now.  All the mortgages have become due."  ENGLISH
thanked Person A for the money and stated, "thank you I really appreciate it."
Shortly thereafter, Special Agents with the Federal Bureau of Investigation
conducted a traffic stop of the vehicle, during which ENGLISH made an
unsuccessful effort to hide the $5,000 under the front floor mat of Person A's
vehicle.

## STATUTORY ALLEGATIONS

### Honest Services Wire Fraud
(18 U.S.C. §§ 1343 and 1346)

45.     Beginning on a date unknown, but at least by January, 2015, and
continuing to in or about January 2021, within the District of Hawaii, JAMIE
KALANI ENGLISH, the defendant, did knowingly devise and intend to devise a
scheme and artifice to defraud the citizens of the State of Hawaii of their right to
ENGLISH's honest and faithful services as an elected legislator and Senate

20

Majority Leader of the Hawaii State Senate, through bribery and concealment of material information.

46.    It was part of the scheme and artifice to defraud that ENGLISH secretly used his official position to enrich himself by accepting bribes from Person A in exchange for ENGLISH's promise of providing, in his official capacity as a member of the Senate, legislative support that would be beneficial to Person A's company.

47.    On or around June 30, 2020, within the District of Hawaii and elsewhere, and for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, ENGLISH did knowingly transmit, and cause to be transmitted, a writing, sign, signal, and sound in interstate commerce, namely, ENGLISH electronically submitted his annual Gift Disclosure Statement with the Hawaii State Ethics Commission.

All in violation of Title 18, United States Code, Sections 1343 and 1346.

Forfeiture Notice

48.    The allegations set forth in this Information are hereby re-alleged and incorporated by reference as though set forth in full herein for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

21

49.     The United States hereby gives notice that, upon conviction of the

offense in violation of Title 18, United States Code, Sections 1343 and 1346 set

forth in this Information, JAMIE KALANI ENGLISH, the defendant, shall forfeit

to the United States any and all property, real or personal, constituting, or derived

from, proceeds traceable to the violation of the offense set forth in this

Information.

50.     If by any act or omission of the defendant, any of the property subject

to forfeiture described in paragraph 49 above:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be

                divided without difficulty,

the United States will be entitled to forfeiture of substitute property up to the value

//

//

//

//

of the property described above in paragraph 49, pursuant to Title 21, United States

Code, Section 853(p).


      DATED:   February 8, 2022   , at Honolulu, Hawaii.


_____

CLARE E. CONNORS #7936
United States Attorney
District of Hawaii


_____

KENNETH M. SORENSON
MICAH SMITH
MICHAEL F. ALBANESE
Assistant U.S. Attorneys


United States v. Jamie Kalani English
Information
Cr. No.