CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

MICHAEL NAMMAR
Chief, Criminal Division

KENNETH M. SORENSON
MICAH SMITH
MICHAEL F. ALBANESE #9421
Assistant U.S. Attorneys
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii     96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:      Ken.Sorenson@usdoj.gov
            Micah.Smith@usdoj.gov
            Michael.Albanese@usdoj.gov

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Feb 15, 2022, 11:46 am
Michelle Rynne, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR. NO. 22-00012 SOM |
| | ) |
| Plaintiff, | ) MEMORANDUM OF PLEA |
| | ) AGREEMENT |
| vs. | ) |
| | ) DATE:   February 15, 2022 |
| JAMIE KALANI ENGLISH, | ) TIME:   10:00 a.m. |
| | ) JUDGE: Hon. Susan Oki Mollway |
| Defendant. | ) |
| | ) |
| | ) |

## MEMORANDUM OF PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the

UNITED STATES OF AMERICA, by its attorney, the United States Attorney for

the District of Hawaii, and the defendant, JAMIE KALANI ENGLISH, and his

attorney, Richard H.S. Sing, Esq., have agreed upon the following:

## THE CHARGES

1.      The defendant acknowledges that he has been charged in an

Information with honest services wire fraud, in violation of Title 18, United States

Code, Sections 1343 and 1346.

2.      The defendant has read the charge against him contained in the

Information, and that charge has been fully explained to him by his attorney.

3.      The defendant fully understands the nature and elements of the crime

with which he has been charged.

## THE AGREEMENT

4.      The defendant agrees to waive indictment and enter a voluntary plea

of guilty to the Information, which charges him with honest services wire fraud.

The defendant is aware that he has the right to have this felony asserted against

him by way of grand jury indictment.   The defendant hereby waives this right and

consents that this offense may be charged against him by way of the Information.

In return for the defendant's plea of guilty to the Information, the government

agrees not to charge the defendant with additional violations of law related to the defendant's acceptance of bribes and other items of value known to the government on the date of this agreement.

5.    The defendant agrees that this Memorandum of Plea Agreement shall be filed and become part of the record in this case.

6.    The defendant enters this plea because he is in fact guilty of honest services fraud as charged in the Information, and he agrees that this plea is voluntary and not the result of force or threats.

## PENALTIES

7.    The defendant understands that the penalties for the offense to which he is pleading guilty include:

a.    A term of imprisonment of up to 20 years and a fine of up to $250,000, plus a term of supervised release of up to 3 years.

b.    In addition, the Court must impose a $100 special assessment as to each count to which the defendant is pleading guilty.   The defendant agrees to pay $100 for each count to which he is pleading guilty to the District Court's Clerk's Office, to be credited to said special assessments, before the commencement of any portion of sentencing.   The defendant acknowledges that failure to make such full advance payment in a form and manner acceptable to the

3

prosecution will allow, though not require, the prosecution to withdraw from this Agreement at its option.

    c.  **Forfeiture.** Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the defendant shall forfeit any and all property, real or personal, constituting, or derived from, proceeds traceable to the violation of the offense set forth in the Information.

    d.  **Restitution.** The Court must also award restitution pursuant to Title 18, United States Code, Section 3663A, to the persons and entities victimized by the defendant's offenses. The defendant understands that the Court will determine the amounts of restitution to be ordered, as well as the persons and entities entitled to such restitution, with the assistance of the United States Probation Office.

## FACTUAL STIPULATIONS

    8.  The defendant admits the following facts and agrees that they are not a detailed recitation, but merely an outline of what happened in relation to the charge to which the defendant is pleading guilty:

    a.  From in or around November 2014 until in or around May 2021, JAMIE KALANI ENGLISH, the defendant, was the Senate Majority Leader of the Hawaii State Senate (the "Senate"), which is one of the two houses of the

4

State of Hawaii legislature.   While holding that position of trust, ENGLISH engaged in a scheme to deprive the citizens of the State of Hawaii of his honest services as an elected legislator and Senate Majority Leader.

b.      As part of his scheme, ENGLISH accepted payments and benefits from "Person A," the owner and operator of a Hawaii-based business.   In exchange for those payments and benefits, ENGLISH agreed to provide, in his official capacity as a member of the Senate, legislative support that would be beneficial to Person A's company.

c.      Furthermore, despite ENGLISH's ethical and statutory obligation to do so, ENGLISH did not disclose these payments on the State of Hawaii mandatory Gift Disclosure Statement required of all legislators who receive a gift valued at more than $200.   By failing to disclose the payments and benefits he received, ENGLISH concealed this material information from both the State Ethics Commission and the people of Hawaii.

<u>ENGLISH's Official Powers in the Senate</u>

d.      At all times relevant to the Information, ENGLISH was a Hawaii State Senator representing the 7th Senatorial District, which includes Hana, East and Upcountry Maui, Molokai, Lanai, and Kahoolawe.   ENGLISH was first elected to the Senate beginning in approximately November 2000 and, over the

years, held a number of positions on various committees.   At times relevant to

this Information, ENGLISH served as the Senate Majority Leader and as Vice

Chair of the Senate Committee on Technology, and was a member of the Senate

Committees on Ways and Means and Transportation.

     e.    ENGLISH was a member of the Cesspool Conversion Working

Group (CCWG), which was established pursuant to Act 132 of the Session Laws

of Hawaii in 2018.   Act 132 recognized that "public health and the quality of

Hawaii's drinking water, streams, ground waters, nearshore marine areas, and

ocean are being harmed by water pollution from cesspools," Act 132, § 1, and

charged the CCWG with developing a comprehensive statewide plan for

converting cesspools to more environmentally-responsible waste treatment systems

or connected sewer systems by the year 2050.   The CCWG was tasked with

providing an interim report of its preliminary findings and recommendations,

including proposed legislation, to the legislature no later than December 31, 2019,

and with submitting a final report, including findings, recommendations, and any

proposed legislation, to the legislature no later than twenty days prior to the

convening of the regular session of 2021.

<u>Person A</u>

6

f.      At all times relevant to the Information, Person A was the owner and operator of a Hawaii-based business that conducted industrial service business throughout the State of Hawaii.   Among other things, Person A's business regularly entered into contracts with county governments to provide services and products in the area of wastewater management.   Person A's business was well positioned to avail itself of publicly financed cesspool conversion projects.

<u>Overview of ENGLISH's Fraudulent Scheme</u>

g.      On a date within the last several years, Person A asked ENGLISH to support the passage of legislation pending before the Hawaii State Senate that would create and fund a large project.   Although the legislation did not specifically provide any contracts to Person A's company, Person A's company had a significant advantage in being awarded a sub-contract because it was one of the few companies that could do the work.   ENGLISH was by this point familiar with the nature of Person A's business.   In response to Person A's request, ENGLISH provided his support to the legislation.   After the legislation passed, Person A gave ENGLISH several thousands of dollars for ENGLISH to purchase food and drinks for a political gathering ENGLISH was attending.

While ENGLISH did not request the funds from Person A, he accepted the money from him/her without reporting their receipt on his annual gift disclosure form.

h.      Beginning in or around 2019, ENGLISH and Person A began to discuss cesspools.   In exchange for a stream of benefits that included hotel rooms and outright cash payments, ENGLISH agreed to support specific legislation that would favor Person A's business.   When ENGLISH was informed that Person A was supportive of the legislation, ENGLISH agreed to take official action to support its passage.   When, at a later date, Person A paid ENGLISH $10,000 in cash to "kill" the legislation, ENGLISH changed course and agreed to do so, while joking with Individual A that "[i]t's easy to kill bills."

<u>ENGLISH and Person A Discussed Cesspools and the CCWG</u>

i.      ENGLISH and Individual A met on or around May 8, 2019. The discussion turned to cesspool legislation, and Person A asked, "I think there's a cesspool committee out too, right?   I don't know how far they've gotten . . . . You can probably get more information on that . . . ."   ENGLISH interjected and said, "well, I'm on the committee."   Person A expressed surprise and added, "that's helpful."   ENGLISH elaborated:   "so I've never attended the meeting purposefully because . . . I don't want to overshadow their work . . . but I get all the

minutes, so I know what's going on . . . [be]cause at the end they have to turn their

report in to the legislature."

      j.     Person A asked ENGLISH if it would be possible to get a copy

of the committee's draft report, and ENGLISH replied, "sure."   At a later point in

the conversation, Person A told ENGLISH, "if there's something I can do for you

Kalani, you let me know."   ENGLISH responded, "thank you."   Person A then

added, "There's gonna be things that I have to ask as well, and I appreciate you, as

my brother and friend . . . there's things that you cannot do, no problem . . . there's

things that I cannot do, no problem.   But, together we find a way."

ENGLISH Solicited Hotel Rooms and Cash and
Agreed to Send Person A the CCWG's Draft Report

      k.     On or around June 7, 2019, ENGLISH called Person A and

informed Person A that he was traveling to Las Vegas, Nevada to attend a concert.

ENGLISH expressly asked Person A to obtain two hotel rooms for him in Las

Vegas, Nevada between June 19, 2019 to June 23, 2019.   During the same call,

ENGLISH also informed Person A that he would send Person A, via email, a draft

report the CCWG had authored.   The draft report identified solutions to convert

cesspools and Person A's company could potentially benefit from having access to

the draft report.   Person A's company would benefit from having early access to

9

the draft report in that Person A would have an opportunity to submit input and/or comments on the draft to ENGLISH.

l.      On or around June 11, 2019, Person A called ENGLISH. During the call, Person A informed ENGLISH that Person A would obtain the Las Vegas rooms for ENGLISH, and explained that Person A would likely put the rooms in Person A's name in order to secure possible comps and discounts. ENGLISH answered, "Oh, cool.   Thank you, oh [Person A], really appreciate it." Then Person A turned to what he/she sought in return:   "No problem, hey hey, so Kalani, um, one thing um, regarding the document, um, for the cesspool stuff can you . . . ."   ENGLISH asked, "Oh, you got it?"   Person A replied that he/she had not yet received the CCWG report.   ENGLISH responded that he had previously sent the report to one of Person A's email addresses but would send the report to another email address belonging to Person A.   ENGLISH explained that the report was still in the draft stage and that he wanted Person A to review it and provide ENGLISH with comments.   ENGLISH stated: "Well it's the draft, so that's why it's now waiting for the comments.   That's why I wanted you to look at it.   Because, if it has comments, then I can, I can send it in.   I can say do this, no we don't like this, we like that."

m.    ENGLISH then turned to another matter for which he sought
Person A's help:   "So, I'm, I'm coming to Honolulu tonight, um, and then I have,
uh, actually you know [Person A] if you can help me with one other thing?"
ENGLISH explained that he had family/friends who were coming into town from
Tahiti.   Person A had never previously met or spoken to ENGLISH's
family/friends from Tahiti.   ENGLISH stated:   "I have, um, like a grandma in,
from, you know, an older lady, her daughter, and her son, grandson, and their
daughter, um, in from Tahiti . . . so I'm going to see them . . . in Honolulu.   Do
you think we could take them out somewhere?"   ENGLISH was, in fact, asking
Person A to host ENGLISH's large family group by attending and paying the
dinner bill.   Person A responded:   "Absolutely, uh well, I may not be able, well,
tomorrow I got like some guests in town from California, but I can help you out
with it."   ENGLISH responded:   "Sure."

n.    Later that day, on or around June 11, 2019, ENGLISH emailed
a copy of the CCWG draft report to Person A.   While at times legislators may
seek input from individuals with specific subject matter knowledge regarding
legislation, the CCWG report was a draft not intended for general public
distribution.   Within its provisions it included, for example, passages such as

11

"Other notes (not to share)"; "Cost SOOO important to narrow the scope"; and "a hypothetical bookend.    Should NOT be included".

      o.     On or around the next day, June 12, 2019, ENGLISH and Person A attended a lunch meeting together.    During the meeting, ENGLISH again informed Person A that Person A could submit draft comments regarding the CCWG report.    ENGLISH stated: "Well they're still open for, you know, because it's a draft—and they are asking us to give comments.    If there's any comments you guys want, just write them out and I can submit it."    Person A then turned to the matter of ENGLISH's request for help with the dinner he was hosting with his Tahitian guests.    Person A stated, "Oh, by the way, housekeeping wise, um, sorry um that I can't make dinner tonight, but um, but anyway, yeah um, this is the help. Five hundred [$500], for you."    ENGLISH accepted an envelope with $500 in cash and said, "Appreciate it."    Person A then told ENGLISH, "Yeah, for like, you know for dinner but thank you for um sending that report."

      p.     ENGLISH and Person A continued their conversation over lunch.    Several topics of small talk arose, including a discussion about the Tahitian guests and where ENGLISH would likely take them.    Person A then told ENGLISH that "if the bill comes in under 300 or 350 just keep it.    You know?" ENGLISH replied, "Ah, thank you."    Person A then made comments indicating

that he/she was providing ENGLISH the money because Person A was focused on the draft report and the possibility of shaping legislation and obtaining financial benefits for Person A's business: "For yourself, yeah. Whatever you hear. You know. But, I want to thank you for like um . . . you know for supporting this and I think in the end, Kalani, um we're going to, you know, collectively there's going to be a lot of um . . . a lot of benefits for everybody in—in return." Person A then flagged for ENGLISH that one thing he noted in the draft report was that "the technology that is called out . . . . We're the only ones that have sole source solution for that." ENGLISH responded, "Cool. Good."

q. On or around June 14, 2019, ENGLISH sent Person A the following instant message: "Mahalo [Person A], I took the family to [Redacted] Chinese restaurant and everyone had crab. They were all very happy. Mahalo again!"

r. Per his agreement with ENGLISH, Person A paid for two hotel rooms in Las Vegas, Nevada that ENGLISH had requested for the dates of June 19, 2019 through June 23, 2019. The total cost for the rooms was $1,805.

<u>ENGLISH Agreed to Support Proposed</u>
<u>Cesspool Legislation Favorable to Person A's Business</u>

s. On or around January 14, 2020, ENGLISH, Person A, and others attended a dinner meeting at a restaurant in Honolulu. During the meeting,

13

Person A told ENGLISH about a House bill relating to cesspools ("House Bill 1")

and described some of the substance of the bill and the pilot program it would

establish.    ENGLISH then offered his legislative services to introduce a Senate

companion bill to House Bill 1, indicating his willingness to introduce a Senate

cesspool bill in order to benefit Person A's business interests.    ENGLISH even

inquired with Person A as to at one point whether Person A wanted a "non-Maui

person to introduce it or do you want a Maui guy . . . ."

<u>ENGLISH Received Email of the Draft Bill and ENGLISH</u>
<u>Confirmed That He Had Introduced a Companion Bill in the Senate</u>

t.    On or around January 21, 2020, Person A emailed ENGLISH a

copy of House Bill 1.

u.    On or around January 23, 2020, Person A called ENGLISH.

During the call, ENGLISH confirmed that he did introduce a companion bill to

House Bill 1.    ENGLISH then clarified that although his Senate bill was similar to

House Bill 1, it was actually a companion to a different bill introduced by another

State Representative ("House Bill 2").

v.    The companion bill of which ENGLISH spoke was S.B. 2380,

which ENGLISH had introduced on or around January 17, 2020.    The thrust of

S.B. 2380 would make funds available to test technologies for waste management

solutions through a pilot program.

14

### Person A Paid ENGLISH $1,000 For Introducing S.B. 2380

  w. On or around February 24, 2020, ENGLISH and Person A and several others met at a restaurant in Honolulu.   During the meeting, Person A gave ENGLISH $1,000 in cash for introducing S.B. 2380.   After providing ENGLISH the $1,000, Person A stated: "That's—that's for you for all that, you know, for putting that—that beautiful, um, . . . bill.   I think it got . . . ." ENGLISH interjected: "Thank you.   It's moving.   Yeah."   Person A responded, "It is?   Oh great."   Person A explained to ENGLISH that "it's a significant project for us—and, um, you know, for the state—but also, you know, for our business, so, you know . . . ."

  x. Later in the dinner conversation, Person A again brought up the topic of the bill and told ENGLISH, "it's good to hear that the bill is moving." Person A said it would be helpful to know where it is, and mentioned that he/she had downloaded the language.   ENGLISH told Person A that "the original language" was from House Bill 2, which was similar to "the one you wanted." ENGLISH then confirmed that "it's moving," and then explained that "I kind of don't pay attention to all the bills," to which Person A replied that he/she would "keep an eye on it" himself/herself.   ENGLISH then explained to Person A that he/she, "should formulate what you would like to see" in the bill.

y.      At a later point in the dinner, ENGLISH explained the status of the bills and what legislative steps were going to happen next.    ENGLISH mentioned that "50 percent of the bills have gone by the wayside right, so we're, things are sorting."    ENGLISH added, "think about what you would like to see the, for the cesspool bills," clarifying that "you don't have to think about the language, just think about the outcomes, I'll, I'll deal with the language."    Person A says, "thank you, ok."    A bit later, ENGLISH talks about the frustrations with how there have been a number of studies, going in "academic circles," and that they need "something to say, ok guys, we're going here.    This is where we're going."    ENGLISH adds that he wants to get the money "out of the UH think tank and get it to the practitioners."    Person A says, "I appreciate that, that's a great idea."

z.      At an even later point in the evening, Person A told ENGLISH, "Kalani, believe me, you've been so, uh, gracious and helpful to me.    I will, um, exhaust the resources to, um . . . try and get, get, you some, um, help, you know, uh . . . and then, um, but I appreciate all the stuff you've done, and um, I'll continue to support you.    And maybe we can find other things, um, that we can collaborate on.    I do appreciate your assistance . . . submission of the bill and then, um, appreciate you providing that recommendation to . . . come up with that,

16

you know, the language, at least, you know, the point of the matter."   ENGLISH

agrees, "yes, because we got to figure out, we've got to get it out of academia,

we've got to move it to the guys that are actually doing it . . . . We can analyze

something until it's blue.   We got to get to, like, what's the best that, given what

we know, this is the best route to go, let's go.   Somebody got to call it, and that's

us, right, that's the politicians, we've got to say, 'nuff information, we're going

this way."   Person A later again says, "well I appreciate the bill, the support and,

you know, um.   It is, the bill's important to us, I mean, not only for our

stakeholders and everything in the future, but, we've been sorta like, working on

this for a while, and kinda banking on it, so . . . ."   ENGLISH responds "it gives

reassurances to your, your investors and your people that government is still there,

that we are, we are, backing this, we're going to be there, and we're going to see

this through, and you need that to carry through your projects."   At the end of the

dinner, Person A paid the group's dinner bill of $592.14, which included

ENGLISH'S dinner and drinks.

### ENGLISH Accepted $10,000 to Kill the Bill

aa.   Although ENGLISH had expressed commitment to helping

pass the cesspool bills when Person A sought that assistance, when Person A asked

at a later date for him to kill the cesspool bills, ENGLISH agreed to do so.   On or

around March 11, 2020, ENGLISH met with Person A.    The meeting took place

in Person A's vehicle.    During the meeting, Person A told ENGLISH that for

unanticipated reasons, he/she needed ENGLISH to delay the passage of the

cesspool bills until next session, and paid ENGLISH $10,000 in cash to see to it

that the cesspool bills were killed.

       bb.    ENGLISH and Person A had the following conversation about

killing the cesspool bills:

> Person A:    I need to, um, delay that bill like until the next session.
> Because then I know like you—you're the one that submitted it so—
> and I don't know how complex this is and I want to—want to—
>
> ENGLISH:    Well it's easy to kill bills.    It's hard to pass them.
>
> Person A:    I need both of those kind of like . . . .
>
> ENGLISH:    You need both of them killed?
>
> Person A: Yeah, yeah.
>
> ENGLISH:    Okay.
>
> Person A:    Is that?    I mean—I mean—you know, I don't know how
> that's done.
>
> ENGLISH:    It's easy to kill bills . . . . This one I can—I can make
> sure it doesn't move in the money committees.    The one that's on the
> House side, um, you know let me just see where it is and I can see it, I
> can just tell the Chairs, hold off . . . .

       cc.    At this point in the conversation, Person A informed ENGLISH

that a nearby envelope contained $10,000 in cash for ENGLISH:

Person A:   So, open up that folder.   I was going to give you this.
Okay, that's like just, cause, and, and the—that's—that's ten
[$10,000].   Uh—the only thing is that, as the economy dips and—
and we're still in a pretty healthy economic position, I want to ensure
that—uhm—now that we're—uh—I mean, we can do this and support
our guys then I want to do it now rather than later when you just kind
of like are tapped out.

ENGLISH: Thank you.

dd.     Person A ended the conversation with ENGLISH by saying, "if
you could really help out with this, Kalani, to ensure . . . and I'm sorry that you had
to, like, go through this for me."   ENGLISH then responded to Person A stating:
"this is all, this all part of the work, right, I mean, like I said, to pass a bill is
difficult.   To kill a bill . . . easy."   Both ENGLISH and Person A laughed, and
Person A then stated that they would talk again "just to get a pulse on what's
happening," and asked ENGLISH to keep him/her posted.   ENGLISH then exited
the vehicle.

<u>Person A Followed up with ENGLISH about the Cesspool Bills</u>

ee.     Following the meeting on or around March 11, 2020, Person A
followed up with ENGLISH to check on the status of ENGLISH's efforts to kill
the cesspool pilot program legislation.

ff.     On or around April 10, 2020, Person A called ENGLISH.
During the call Person A explained that his/her partners were concerned about the

status of the cesspool legislation and were looking for assurances.    In response, ENGLISH told Person A that "because we, um, we, we suspended the legislature . . . basically everything froze in place. . . all of these types of bills. . . these will die. But they'll just, they'll remain there, and we probably will not go back into session . . . . all the bills will die."    Person A responded that his partners were "insecure" and put a lot of "resources" and "effort" into the matter.    Person A then pressed ENGLISH for an assurance that ENGLISH would indeed follow through with killing the cesspool legislation if it came back before the legislature.    ENGLISH responded: "absolutely."

      gg.    On or around June 30, 2020, Person A made another call to ENGLISH.    During the call, Person A followed up with ENGLISH on the status of the bills:

> Person A:   I also wanted to touch base with you on the, you know, thing we're working on with that bill . . . and you know see how everything is going with that.
>
> ENGLISH:    Yeah none of it is moving right?
>
> Person A:    Well yeah, well yeah last I checked, but, you know I just was checking to see.
>
> ENGLISH:    Yeah, I, I, actually have been, I think, I, I been keeping an eye on it so I don't think any of it is, any of it is moving.    Um, there have been a few bills that have, that have caught us by surprise that the House moved in.    Of course, we moved a few that caught them by surprise, but none of those.

Concealment of Material Information

hh.     As mentioned above, as a state legislator, ENGLISH was
required by Hawaii State law to make an annual gift disclosure, on or before June
30 of each year, of any gifts received during the previous year ending the
preceding May 31, "valued singly or in the aggregate in excess of $200, whether
the gift is in the form of money, service, goods, or in any other form" whenever the
"source of the gift or gifts have interests that may be affected by official action or
lack of action by the legislator or employee."

ii.     The gift disclosures for gifts received between June 1, 2019
through May 31, 2020, were due by June 30, 2020.   ENGLISH electronically
filed his annual gift disclosure statement with the Hawaii State Ethics Commission
on June 30, 2020.

jj.     In his gift disclosure, ENGLISH knowingly and purposefully
failed to declare the receipt of any of the funds or financial benefits conferred upon
him by Person A, including the hotel rooms provided to him in June 2019 at a cost
of $1,805, the $500 in cash provided to him in June 2019, the $1,000 in cash
provided to him in February 2020, or the $10,000 in cash provided to him in March
2020.

21

kk.   At the same time, ENGLISH disclosed small gifts he received from legitimate sources during that same time period, including, among other things, gifts of $7 worth of trail mix from a private company, $10 worth of chili pepper water from the County of Kauai, a $20 goody and snack bag from the Maui County Council, and a $22 grocery bag of vegetables from a law firm.   ENGLISH also disclosed travel and hotel stipends that he received from legitimate sources, including a $200 hotel stipend from the National Conference of State Legislatures.

ll.   By failing to lawfully disclose payments and benefits that he accepted for agreeing to perform official acts on his annual gift disclosure form, ENGLISH purposefully concealed corrupting influences on his performance as a State Senator, and defrauded the citizens of Hawaii, who were entitled to ENGLISH's honest and faithful services and entitled to know what gifts ENGLISH had received during the course of his employment.

mm.   ENGLISH's electronic filing of his gift disclosures on June 30, 2020, was transmitted in interstate commerce. This interstate wire was an essential part of ENGLISH's scheme because it facilitated ENGLISH's filing of a gift disclosure that concealed material information about multiple payments and benefits ENGLISH had received from Person A during the previous year.

ENGLISH Accepted Another $5,000 Payment

nn.     On January 14, 2021, ENGLISH and Person A met in Person A's vehicle in the Kakaʻako area of downtown Honolulu.    After ENGLISH entered the vehicle, Person A handed him an envelope and told him, "that's money for you. $5,000."    Person A then thanked ENGLISH for "all his support" and indicated the type of legislative assistance he/she would need from ENGLISH. ENGLISH accepted the cash and told Person A, "I can definitely use that right now.    All the mortgages have become due."    ENGLISH thanked Person A for the money and stated, "thank you I really appreciate it."    Shortly thereafter, Special Agents with the Federal Bureau of Investigation conducted a traffic stop of the vehicle, during which ENGLISH made an unsuccessful effort to hide the $5,000 under the front floor mat of Person A's vehicle.

9.     Pursuant to CrimLR 32.1(a) of the Local Rules of the United States District Court for the District of Hawaii, the parties agree that the charge to which the defendant is pleading guilty adequately reflects the seriousness of the actual offense behavior and that accepting this Agreement will not undermine the statutory purposes of sentencing.

## SENTENCING STIPULATIONS

10.     Pursuant to CrimLR 32.1(b) of the Local Rules of the United States District Court for the District of Hawaii and Section 6B1.4 of the Sentencing Guidelines, the parties stipulate to the following for the purpose of the sentencing of the defendant in connection with this matter:

a.     As of the date of this agreement, it is expected that the defendant will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offense and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility.   If all of these events occur, and the defendant's acceptance of responsibility continues through the date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate.   *See* U.S.S.G. § 3E1.1(a) and Application Note 3.

b.     The United States Attorney agrees that the defendant's agreement herein to enter into a guilty plea constitutes notice of intent to plead guilty in a timely manner, so as to permit the government to avoid preparing for trial as to the defendant.   Accordingly, the United States Attorney anticipates moving in the Government's Sentencing Statement for a one-level reduction in sentencing offense level pursuant to Guideline § 3E1.1(b)(2), if the defendant is

24

otherwise eligible.    The defendant understands that notwithstanding its present intentions, and still within the Agreement, the prosecution reserves the rights (1) to argue to the contrary in the event of receipt of new information relating to those issues, and (2) to call and examine witnesses on those issues in the event that either the United States Probation Office finds to the contrary of the prosecution's intentions or the Court requests that evidence be presented on those issues.

11.    The parties agree that notwithstanding the parties' Agreement herein, the Court is not bound by any stipulation entered into by the parties but may, with the aid of the presentence report, determine the facts relevant to sentencing.    The parties understand that the Court's rejection of any stipulation between the parties does not constitute a refusal to accept this Agreement since the Court is expressly not bound by stipulations between the parties.

12.    The parties represent that as of the date of this agreement there are no material facts in dispute.

### APPEAL/COLLATERAL REVIEW

13.    The defendant is aware that he has the right to appeal his conviction and the sentence imposed.    The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, his conviction and any sentence within the Guidelines range as determined by the Court at the time of

sentencing, and any lawful restitution order imposed, or the manner in which the sentence or restitution order was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement. The defendant understands that this waiver includes the right to assert any and all legally waivable claims.

a. The defendant also waives the right to challenge his conviction or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255, except that the defendant may make such a challenge (1) as indicated in subparagraph "b" below, or (2) based on a claim of ineffective assistance of counsel.

b. If the Court imposes a sentence greater than specified in the guideline range determined by the Court to be applicable to the defendant, the defendant retains the right to appeal the portion of his sentence greater than specified in that guideline range and the manner in which that portion was determined and to challenge that portion of his sentence in a collateral attack.

c. The prosecution retains its right to appeal the sentence and the manner in which it was determined on any of the grounds stated in Title 18, United States Code, Section 3742(b).

## FINANCIAL DISCLOSURE

14.     In connection with the collection of restitution or other financial

obligations, including forfeiture as set forth below, that may be imposed upon him,

the defendant agrees as follows:

a.     The defendant agrees to fully disclose all assets in which he has

any interest or over which he exercises control, directly or indirectly, including any

assets held by a spouse, nominee, or third party.   The defendant understands that

the United States Probation Office (USPO) will conduct a presentence

investigation that will require the defendant to complete a comprehensive financial

statement.   To avoid the requirement of the defendant completing financial

statements for both the USPO and the government, the defendant agrees to

truthfully complete a financial statement provided to the defendant by the United

States Attorney's Office.   The defendant agrees to complete the disclosure

statement and provide it to the USPO within the time frame required by the United

States Probation officer assigned to the defendant's case.   The defendant

understands that the USPO will in turn provide a copy of the completed financial

statement to the United States Attorney's Office.   The defendant agrees to provide

written updates to both the USPO and the United States Attorney's Office

regarding any material changes in circumstances, which occur prior to sentencing,

within seven days of the event giving rise to the changed circumstances.   The

defendant's failure to timely and accurately complete and sign the financial

statement, and any written update thereto, may, in addition to any other penalty or

remedy, constitute the defendant's failure to accept responsibility under U.S.S.G §

3E1.1.

      b.     The defendant expressly authorizes the United States

Attorney's Office to obtain his credit report.   The defendant agrees to provide

waivers, consents, or releases requested by the United States Attorney's Office to

access records to verify the financial information, such releases to be valid for a

period extending 90 days after the date of sentencing.   The defendant also

authorizes the United States Attorney's Office to inspect and copy all financial

documents and information held by the USPO.

      c.     Prior to sentencing, the defendant agrees to notify the Financial

Litigation Program of the United States Attorney's Office before making any

transfer of an interest in property with a value exceeding $1,000 owned directly or

indirectly, individually or jointly, by the defendant, including any interest held or

owned under any name, including trusts, partnerships, and corporations.

**FORFEITURE**

15.     As part of his acceptance of responsibility and pursuant to Title 18,

United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461, the defendant agrees as follows:

        a.      The defendant consents to the entry of a money judgment in the

amount of $15,305, reflecting the amount of the proceeds of the offense charged in

the Information (the "Forfeiture Money Judgment").

        b.      The defendant knowingly and voluntarily waives and agrees to

waive any and all constitutional, statutory, and other challenges to the forfeiture on

any and all grounds, including that the forfeiture constitutes an excessive fine or

punishment under the Eighth Amendment.    The defendant waives all

constitutional, legal, and equitable defenses to the entry of and collection of the

Forfeiture Money Judgment.    The defendant knowingly and voluntarily waives

any right to a jury trial on the forfeiture of property.

        c.      The defendant agrees to consent promptly upon request to the

entry of any orders deemed necessary by the government or the Court to complete

the forfeiture and disposition of the property.    The defendant waives the

requirements of Rules 32.2 and 43(a) of the Federal Rules of Criminal Procedure

regarding notice of forfeiture in the charging instrument, announcement of

forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant acknowledges that he understands that the forfeiture of the property, if the government elects to conduct the forfeiture criminally, will be part of the sentence imposed upon the defendant in this case and waives any failure by the Court to advise the defendant of this, pursuant to Rule 11(b)(1)(J) of the Federal Rules of Criminal Procedure, during the change of plea hearing. Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, the defendant consents to the Forfeiture Money Judgment becoming final as to the defendant when entered.

       d. The defendant understands that the forfeiture of the forfeitable property does not constitute and will not be treated as satisfaction, in whole or in part, of any fine, restitution, reimbursement of cost of imprisonment, or any other monetary penalty this Court may impose upon the defendant in addition to the forfeiture.

       e. The defendant represents and agrees that, within the meaning of 21 U.S.C. § 853(p), the Forfeiture Money Judgment amount represents property subject to forfeiture that, as a result of any act or omission of the defendant,

            (A) cannot be located upon the exercise of due diligence;

            (B) has been transferred or sold to, or deposited with, a third party;

            (C) has been placed beyond the jurisdiction of the court;

30

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided without difficulty.

f.      Payment of the Forfeiture Money Judgment shall be made by postal money order, bank check, or certified check payable to the United States Marshals Service.   On or before the date he ~~enters his plea of guilty pursuant to~~ is sentenced, ~~this agreement,~~ the defendant shall cause said check to be hand-delivered to the Asset Forfeiture Unit, United States Attorney's Office, District of Hawaii, PJKK Federal Building, 300 Ala Moana Boulevard, Room 6-100, Honolulu, Hawaii 96850, with the criminal docket number noted on the face of the check.

g.      If the Forfeiture Money Judgment is not paid on or before the date the defendant ~~enters his plea of guilty pursuant to this agreement,~~ is sentenced, interest shall accrue at the judgment rate of interest (as defined by 28 U.S.C. § 1961) on any unpaid portion thereof at the judgment rate of interest from that date. Furthermore, if the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the date of his ~~guilty plea,~~ sentencing, the defendant consents to the forfeiture of any other property alleged to be subject to forfeiture in the Information, including substitute assets, in full or partial satisfaction of the money judgment, and remains responsible for the payment of any deficiency until the Forfeiture Money Judgment, including any accrued interest, is paid in full.

31

## IMPOSITION OF SENTENCE

16.    The defendant understands that the District Court in imposing

sentence will consider the provisions of the Sentencing Guidelines.    The

defendant agrees that there is no promise or guarantee of the applicability or non-

applicability of any Guideline or any portion thereof, notwithstanding any

representations or predictions from any source.

17.    The defendant understands that this Agreement will not be accepted or

rejected by the Court until there has been an opportunity by the Court to consider a

presentence report, unless the Court decides that a presentence report is

unnecessary.    The defendant understands that the Court will not accept an

agreement unless the Court determines that the remaining charge adequately

reflects the seriousness of the actual offense behavior and accepting the Agreement

will not undermine the statutory purposes of sentencing.

## WAIVER OF TRIAL RIGHTS

18.    The defendant understands that by pleading guilty he surrenders

certain rights, including the following:

a.    If the defendant persisted in a plea of not guilty to the charges

against him, then he would have the right to a public and speedy trial.    The trial

could be either a jury trial or a trial by a judge sitting without a jury.    The

32

defendant has a right to a jury trial.   However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the prosecution, and the judge all must agree that the trial be conducted by the judge without a jury.

b.      If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random.   The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges.   The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty.   The jury would be instructed that the defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt.

c.      If the trial is held by a judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not he or she was persuaded of the defendant's guilt beyond a reasonable doubt.

d.      At a trial, whether by a jury or a judge, the prosecution would be required to present its witnesses and other evidence against the defendant.   The defendant would be able to confront those prosecution witnesses and his attorney would be able to cross-examine them.   In turn, the defendant could present witnesses and other evidence on his own behalf.   If the witnesses for the

33

defendant would not appear voluntarily, the defendant could require their

attendance through the subpoena power of the Court.

   e.   At a trial, the defendant would have a privilege against

self-incrimination so that he could decline to testify, and no inference of guilt

could be drawn from his refusal to testify.

   ~~f.   At a trial, the defendant would have a right to have the jury~~   *SOM*

~~determine beyond a reasonable doubt the quantity and weight of the controlled~~

~~substance charged in the Information necessary to establish the statutory~~

~~mandatory minimum penalty or an increased statutory maximum penalty.~~

   19.   The defendant understands that by pleading guilty, he is waiving all of

the rights set forth in the preceding paragraph.   The defendant's attorney has

explained those rights to him, and the consequences of the waiver of those rights.

## USE OF PLEA STATEMENTS

   20.   If, after signing this Agreement, the defendant decides not to plead

guilty as provided herein, or if the defendant pleads guilty but subsequently makes

a motion before the Court to withdraw his guilty plea and the Court grants that

motion, the defendant agrees that any admission of guilt that he makes by signing

this Agreement or that he makes while pleading guilty as set forth in this

Agreement may be used against him in a subsequent trial or other proceeding if the

34

defendant later proceeds to trial.   In particular, by signing this agreement, the

defendant agrees that all of the statements in paragraphs 8.a. through 8.oo. above

are accurate and truthful, and by signing this agreement, the defendant accepts that

those factual stipulations are truthful admissions that may be used against him in a

subsequent trial or other proceeding.   By signing this agreement, the defendant

voluntarily, knowingly, and intelligently waives any protection afforded by Rule

11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal

Rules of Evidence regarding the use of statements made in this Agreement,

including the statements in paragraphs 8.a. through 8.oo. . above, or during the

course of pleading guilty when the guilty plea is later withdrawn.   The *only*

exception to this paragraph is where the defendant fully complies with this

Agreement but the Court nonetheless rejects it.   Under those circumstances, the

United States may not use those statements of the defendant for any purpose.

21.   The defendant understands that the prosecution will apprise the Court

and the United States Probation Office of the nature, scope and extent of the

defendant's conduct regarding the charges against him, related matters, and any

matters in aggravation or mitigation relevant to the issues involved in sentencing.

## COOPERATION

22.     The defendant agrees that he will fully cooperate with the United

States.

a.     The defendant agrees to testify truthfully at any and all trials,

hearings, or any other proceedings at which the prosecution requests him to testify,

including, but not limited to, any grand jury proceedings, trial proceedings

involving co-defendants and others charged later in the investigation, sentencing

hearings, and related civil proceedings.

b.     The defendant agrees to be available to speak with law

enforcement officials and representatives of the United States Attorney's Office at

any time and to give truthful and complete answers at such meetings, but he

understands he may have his counsel present at those conversations, if he so

desires.

c.     The defendant agrees he will not assert any privilege to refuse

to testify at any grand jury, trial, or other proceeding, involving or related to the

crimes charged in this Information or any subsequent charges related to this

investigation, at which the prosecution requests him to testify.

d.     The defendant agrees that his sentencing date may be delayed

based on the government's need for the defendant's continued cooperation, and

36

agrees not to object to any continuances of the defendant's sentencing date sought by the United States.

e.      Pursuant to Section 1B1.8(a) of the Sentencing Guidelines, the prosecution agrees that self-incriminating information provided pursuant to this Agreement to cooperate will not be used in determining the applicable guideline range, except as may be provided in this Agreement and under Section 1B1.8(b) of the Sentencing Guidelines.

23.     In the event that the defendant does not breach any of the terms of this Agreement but the Court nonetheless refuses to accept the Agreement after the defendant has made statements to law enforcement authorities or representatives of the United States Attorney's Office pursuant to this Agreement, the prosecution agrees not to use said statements in its case-in-chief in the trial of the defendant in this matter.   The defendant understands that this does not bar the use of information and evidence derived from said statements or prohibit the use of the statements by the prosecution in cross-examination or rebuttal.

24.     Pursuant to Guidelines § 5K1.1 and Rule 35(b) of the Federal Rules of Criminal Procedure, the prosecution may move the Court to depart from the Guidelines on the ground that the defendant has provided substantial assistance to authorities in the investigation or prosecution of another person who has

37

committed an offense.   Pursuant to Title 18, United States Code, Section 3553(e), the prosecution may also move the Court to impose a sentence below the level established by statute as a minimum sentence for charge in Count 1 on the ground that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense.   The defendant understands that:

      a.     The decision as to whether to make such a request or motion is entirely up to the prosecution.

      b.     This Agreement does not require the prosecution to make such a request or motion.

      c.     This Agreement confers neither any right upon the defendant to have the prosecution make such a request or motion, nor any remedy to the defendant in the event the prosecution fails to make such a request or motion.

      d.     Even in the event the prosecution makes such a request or motion, the Court may refuse to depart from the Guidelines or to impose a sentence below the minimum level established by statute.

      25.    The defendant and his attorney acknowledge that, apart from any written proffer agreements, if applicable, no threats, promises, agreements or conditions have been entered into by the parties other than those set forth in this

Agreement, to induce the defendant to plead guilty.   Apart from any written

proffer agreements, if applicable, this Agreement supersedes all prior promises,

agreements or conditions between the parties.

26.    To become effective, this Agreement must be signed by all signatories

listed below.

27.    Should the Court refuse to accept this Agreement, it is null and void

and neither party shall be bound thereto.

AGREED:

CLARE E. CONNORS
United States Attorney
District of Hawaii


_____
MICHAEL NAMMAR
Chief, Criminal Division


Dated:   2/14/2022


_____
KENNETH M. SORENSON
MICAH SMITH
MICHAEL F. ALBANESE
Assistant U.S. Attorneys

Dated:   2/14/22


_____
JAMIE KALANI ENGLISH
Defendant


Dated:   14 Feb 2022


_____
RICHARD H.S. SING
Attorney for Defendant


Dated:   2/14/22


39